at all. Or arguments not to exceed 15 minutes per side. Mr. David Blake for the appellant. Give me one second here, counsel. Get my act together. Okay, you may proceed. Good morning, your honors. Dave Blake on behalf of the appellant Perlie Jackson. I would respectfully request two minutes for rebuttal. You may. Your honors, the district court erred in granting appellee's motion for summary judgment on the basis of qualified immunity for the following reasons. We have a Michigan State Police report that unequivocally shows that at the time Mr. Stanley Jackson was tased, there was two officers on top of him. And the Sixth Circuit law is quite clear that when even a single tasing, in this case there was in excess of four tasers that were utilized in taking Mr. Jackson into custody, the Sixth Circuit is clear that if a person is neutralized, it is objectively unreasonable to continue the taser blast. And that's what happened in this case. And I'm going to specifically rely on the arguments set forth in my brief, but I just wanted to point to the Hagins case, and also the Michigan State Police report that shows that, again, there was two officers on top of Mr. Jackson at the time he was taken into custody. So, counsel, as I read it, and help me here, this whole series of events covered six, seven minutes. There's the appendix at page ID 392, which is the transcript of the audio, plus coming from the same police reports, I think. There's quite a period of time. Do you say that each one of the four tasings was excessive force? And if not, which ones are? And would you specifically address the way I read the record that after the first tasing, he does become rigid and convulsing? And the officers spend three or four minutes kind of saying, hey, you know, let's get, you know, fellow, we're here to help you. And it's only after he comes out of it that then you get several minutes of flailing and they may be on top of him, but they haven't got his arms and so on and so on. So it's not like they just jump on him and tase him four times. This is spaced out, so can you be a little more specific about where the unnecessariness comes? Your Honor, you're correct. In that series of six or seven minutes, I would not dispute that there was resistance on behalf of Mr. Jackson. I think, though, if you look specifically at that Michigan State Police report, and I unfortunately don't have the timing in my brief or with me today, but what I'm focusing on is the evidence that shows that at one point in time, Mr. Jackson was prone on the ground with two officers on top of him, and I believe there was two taser discharges at that point in time. That's what I'm focusing on as far as my argument. But what you call the two officers on top of him, there's points at which Urban and Mercuri have got hold of an arm and are trying to hold him on the floor, and at least, again, from this appendix, which is keyed to the transcript, he's trying to get his arms under his body, he refuses to comply, they try to get handcuffs on him, and they aren't able to. Then the female officer comes in, seems to be clear that he tries to bite her, so there's a difference between having somebody down and prone and he's not doing anything because he's sitting on you, or you're sitting on him, and wrestling with him, which seems to go on for some considerable period of time, including all of the tasings. What you call the Michigan Police Report, it's quite a thick document. That's why I was trying to get you to focus on a particular event, because the part that seems closest to that is when Urban and Mercuri are trying to get his arms behind him and not succeeding. They are on him, but his arms are still flailing and moving. Is that fair? Yes, Your Honor, that's what I was focusing on. Go ahead. So what were they supposed to do? Well, I think, Judge White, when they have someone in that set of circumstances and they have the person lying on the ground, I don't think it's reasonable to discharge a taser two times at that point in time. Following a taser, I mean, this is a series of events, and I just don't think that that's reasonable under the law. What were they supposed to do? Place him under arrest. And do what? Pardon me? I'm just trying to find out what would a reasonable officer have done under these circumstances. There certainly were a bunch of them, but they couldn't get him handcuffed. What should they have done? Again, I think that there was at least two taser shots that were discharged before the incident that I'm focusing on, and I think that when you have that number of officers, it's just objectively unreasonable to continue tasing a person. So I want to go back to the timeline. You acknowledged for Judge Boggs that after the initial tasing or initial round or whatever, Mr. Jackson was clearly in distress from the officer's perspective. They were so worried that they called an ambulance, and they called a second one to have it be expedited because they were concerned. They were trying to make certain that he could relax and that his breathing and everything was restored so that they could, I guess, make certain that he wasn't back okay. So if we assume that that takes about three minutes, as you conceded with Judge Boggs, then in that remaining four minutes after they got him sort of normalized, there were, what, three more rounds of tasing? That's correct, Your Honor. Okay. And so you, on the first one, his body became rigid, and so they couldn't get him handcuffed in because he was almost in kind of a catatonic state. Right. After they got him back around, then they still couldn't get the handcuffs on, so there was some struggling. And did the biting incident come in the second attempt? Yes. Okay. And so after that, there were two more taser rounds. The biting is after the third one. That's when the female officer, Ms. Farmer, gets into it. That's correct. What precipitated the second tasing then? Because, I mean, I think we all agree that when Mr. Jackson tried to bite the officer that the officers have to take some response, but let's look at two and four. What precipitated two? What precipitated four? Well, that's the question, Your Honor, because, again, we have the first series of taser discharges, and then we have the record, which I indicated to Judge Boggs, where we have the two officers on top of Mr. Jackson, who's prone on the ground at that time. That's what I'm focusing on as far as my argument with respect to what was objective. When they have him prone on the ground and the two officers on top of him, is he on his back or on his stomach? Stomach. Stomach. And what about the types of tasing? As far as what, Judge White? The length? As far as a drive stun or a prong? Yeah, or a probe. What about that? Does that matter what kind they used? From my experience, Your Honor, there's different circumstances dictate when they'll use a drive stun versus a prong discharge, and I think when they're on top of somebody such as Mr. Jackson, the appropriate method is to use a drive stun because it's closest to the body. I know that the prong discharge is more powerful than the drive stun, and that's what they utilized here. And isn't my understanding, and I recognize that you're an expert who says something a bit different, but as I read the record, these tasers have, in effect, a black box about how they're discharged, and they say that two, three, and four are drive stun. Any feedback here? That's correct, Your Honor. Okay. And just to be clear about theóI keep getting the feedback. I may have gotten too close. The biting is between three and four, so if you think it's okay in response to biting, then it's two and three that we're concerned about. And as I read the record, sometimes he's on his back, sometimes he's on his stomach. They're trying to get him on his stomach so they can get their hands behind him, and he keeps trying to get them in front of him, is the way that I say this appendix is really quite extensive about what's happening there because they tell him to get on his stomach, and it's only a little bit later that he actually does. Is that a fairó That's fair, Your Honor. Okay. Are you relying on the expert report that seems to say that there was a prong in his hat and that there was more than one prong discharge? Yes, Your Honor. I think that there was at least two prong discharges, just for the record. If you don't have any other questionsó Okay. Thank you, Counsel. You'll have your two minutes for rebuttal. Thank you. Good morning. May it please the Court. Keith Eastland from the law firm of Miller Johnson in Grand Rapids, Michigan, on behalf of the defendants, Washtenaw County, as well as the deputies involved, deputies Urban, McCure, Farmer, and Reich. Your Honors, the issue raised in this appeal is pretty straightforward. Did Judge O'Rourke, the defendant, correctly grant qualified immunity? Because there is no factual dispute, one, that Mr. Jackson, who was a person of a known convicted felon with eight felonies involving drugs and guns and prior resisting arrests, fled from a felony drug bust after two buys and actively resisted, as counsel for appellant now acknowledges, actively resisted throughout the encounter. And Judge Hood followed well-established Sixth Circuit case lawó So you just keep tasing somebody until they lie perfectly still? No, Your Honor. And there's no evidence to support that that's what happened in this case. Indeed, the first taser was only issuedóto follow up on your question beforeó was the dart or probe mode. And that was done when Mr. Jackson had retreated, reaching for his waistband, and then took off running after he was commanded to stop. He was also given a warning that he would be tased. He went in through the open garage, in through the kitchen, tried to close the door on Deputy Urban. And at that point, he turned, facing Deputy Urban, as if he was reaching for or continuing to reach for his waistband, which the officer, under those facts, reasonably believed that he was brandishing a deadly weapon. That's when the first probe mode was made. And I don't believe there's any dispute that that was a reasonable use of force under the Sixth Circuit standard. Thereafter, as has been noted here, there's sort of the group of drive-stun mode. But there is three minutes and 48 seconds, by my calculations, when you listen to the recording. Between the time that they initially tased Mr. Jackson, he does fall to the ground and he does exhibit some symptoms, which Officer McCure noted were a concern, and so he did call the ambulance. But it is undisputed that after those taser effects wore off, both officers testified that those effects were gone. Like the muscles tense, the dart mode, when it hits a person, I'm not a scientist here, but it basically inhibits their ability to move their muscles. It tenses them up and then they fall. And it's transient, it's very short, and it doesn't last for very long. And both officers who witnessed Mr. Jackson after he was stunned testified that he was tense, but he untensed, and he regained control. And that's a critically undisputed fact. The release lasted long enough for them to be concerned about his fixed stare, unblinking mode, other things. And during that period, so the officers didn't pat him around the waist at that time to check for a gun, because this is the basis for them later on fearing that when he went back to his waistband there may have been a weapon. But during that initial period, no pat down for a weapon around the waist. There is no evidence in the record that the officers sought to do that during that time. But at the same time, they were concerned and they wanted to call the ambulance and they did. And they also wanted to get him cuffed, because remember, this is a convicted felon who fled into the house. And remember, he was screaming as he ran into the house before any use of force was there. So the officers had legitimate concern that, hey, this could be a drug house, there may be other people. Why is he screaming when he's running in? There may be other people with other guns, other things. So they wanted to get him handcuffed, but they also recognized, as a reasonable officer would, that there are some signs that there may be a need for an ambulance. So they're not medical professionals. They called the ambulance. But then at that point, three minutes later, when he regains, and it's undisputed that Mr. Jackson regained control of his muscles, and he's refusing to be handcuffed. Again, the Sixth Circuit law is clear. When you're refusing and actively resisting, and it's in effect... But it's also pretty clear that you have to respect the fact that somebody is going through this physical ordeal having been tased. Correct, but the threat to officer safety still exists until the suspect is secured and they needed to get him handcuffed. And once they did that, there was absolutely no evidence, because they didn't, there was no more use of force. Once he was secure and handcuffed, he was rolled over on his side, he was not touched. But there's this massive concern for officer safety, and you've got this person immobile initially for some period of time. You've seen them go to the area of their waistband, and you don't take a two-second pat around the waist to make sure there's no weapon there? Perhaps in hindsight, if that were the standard 2020 hindsight, and we don't know if they did that or not, but in hindsight that may have been something that they could have done. I don't dispute that, Your Honor. But the record here doesn't show that they did it, and the record here shows that they had concerns about securing the entire house, and certainly under the qualified immunity standard, even if this court were to think somehow that a reasonable officer would violate the Constitution in those circumstances, a reasonable officer would not be on notice of that. There's absolutely no way that that would meet the Ashcroft v. Al-Kid standard, in my view. We have to look at, though, the justification for the four separate tasings that ultimately led to apparently the death of this person and whether or not that was unreasonable force applied under the facts and circumstances of that case. Correct, and I would submit, Your Honor, that the drive-stun three that occurred while Mr. Jackson was undisputedly actively resisting, attempting to bite one of the officers, and also one of the handcuffs, they couldn't get them together, so they had one on one wrist, one on the other, and they were trying to link them together. They couldn't, and at one point, it's in Deputy Holly Farmer's report, the right arm got loose, and there was an open cuff with a serrated edge that was a significant safety risk. So again, and if you look at that short period of time where the officers tased him, and obviously for the purpose of this appeal, we have to assume that all three of those drive-stuns connected, but there's some dispute about whether the middle one, the third one, by Officer McCure connected. But that's reasonable in the sense of getting the suspect under control. In one of the cases that I would like to identify for the court, it's not referenced in our brief specifically, and that's Jackson versus the Wilkins. It's a decision from 2013, 517 Federal Appendix 311. In that case, I think it's very factually similar, not just because the suspects had the same surname, but in that case, the second Mr. Jackson assaulted his girlfriend and they called the police and she reported that they stole a car. Well, that Mr. Jackson approached police with his hands up as if he may be compliant, and then he stiff-arms the officer and runs. So what does the officer do? Turns after him, he's running, just like Deputy Urban in this case, shoots a taser at him in dart mode. He falls to the ground. After that suspect falls to the ground, the second Mr. Jackson and the Wilkins decision, he's tased 11 times in two minutes. When he first gets tased, he falls and he hits a metal barricade to his chest and he does a back flip, I think is the testimony, or a flip over of some sort. Even after that, the officers, he still struggled, and so they had to detain him, and in getting him handcuffed and secured, 11 times they tased him in two minutes. And this court held that that was not unreasonable and that the officers weren't entitled to qualified immunity. Now, there's a separate count for indifference to medical needs that the officers put him in the back of a car for 40 minutes and didn't get him any treatment when he was pleading for help, etc. And there was an issue of fact on that. But that's not our case. Our officers had called the police. Are there any limitations on how much you can use a taser? Any limitations in what sense, Your Honor? Just that whether it's because of medical reasons or whatever, any limitations imposed on? The limitations imposed would be using your training, obviously, and using the nonlethal force in a manner consistent with the circumstances. And when you have an actively aggressive, combative, and remember- There are no standards that say you can't tase somebody more than four times in a minute, or there's nothing like that. Not that I'm aware of, and certainly not in this record, Your Honor. There's been no testimony. Well, okay. And what about the expert report that seems to say that there was more than one tasing in probe mode? Correct. The expert report, Burnwell is the expert's name. During his deposition, if you review that testimony, he acknowledged that, one, the officers were faced with a person who was resisting throughout, actively resisting throughout. And he acknowledged that he had no basis to conclude that more than one dart mode shot was fired. In fact, there was only one probe that was actually recovered as evidence. And he acknowledged during his deposition after his report that the abrasions and the burn marks on the body were consistent with drive-stun mode. And again, acknowledging that the taser download reports that are in the record clearly show that there was only one dart mode. And the officers understood that. They didn't. And, in fact, what happened was in one of the reports, I can't remember if it was McHugh or Urbans, one of the officers said to the other, hey, drive-stun mode because that's what you do at that point. It's a tool. It's a localized pain tool. It gets kind of like a police baton at that point. And also you are in direct contact with them. Correct. If he's across the room, you have to shoot the dart. If you're on top of him, as they say. So you've talked a lot about that he was actively resisting throughout, and it's clear that attempting to bite the officer would be actively resisting. Talk to me about, in your mind, the distinction between the active resistance and an example of passive resistance. Sure, Your Honor. Passive resistance would be a situation where a person is simply noncompliant. They say put your hands behind your back, and they stiff arm, and don't move. Right. A good example would probably be the decision in Eldridge, which you're very familiar with, in which case there was a dispute about the driver who was having a, I think they were diabetic, and the officers went in, he had crashed, and he wouldn't get out of the car. The officers went in at that point, they shut the car off, so that was no longer a threat or a danger, and he wouldn't get out of the car. And I think the decision was that there was an issue of fact as to whether he had gone into active resisting. But this case doesn't even... This is a case where the guy wouldn't come out of his house, apartment. He wasn't doing anything. He was passively saying, I'm not going to come out. I'm sorry, I didn't catch the... Goodwin. The Goodwin case. Oh, the Goodwin case. Yes, the Knowles, Mr. and Mrs. Knowles. It was a noise complaint, not a convicted felon. That's passively resisting. He's over there, you're over here. Correct. Correct, Your Honor. Mr. Knowles, in fact, those officers busted down the door of his house. I mean, they committed, in my view, an easy violation of the Fourth Amendment. And they may have not liked the fact that Mr. Knowles was passively resisting in the sense of exercising his rights, which I wouldn't call passive resisting, but that would be a case. And certainly there is some case law that suggests that there needs to be some objective manifestation. I know the recent decision in Gillespie, I think authored by Judge McKeague, and I believe there's a concurrence by, Your Honor, Judge Donald, kind of highlights where there can be disagreement sometimes on the facts. We don't have that here. This isn't close. This is active resistance under the clear cases of the Sixth Circuit. If we, let's say hypothetically, we find that the qualified immunity is not warranted, is there an obvious issue of fact in this case? Because I know this is a qualified immunity case. I think there is no issue of fact as to the reasonableness of the force. When you consider the three grand factors, the seriousness of the offense, the threat, and the act of resistance, there is no issue of fact, and thus the first prong of qualified immunity is there can't be proven to the jury an actual violation of the Fourth Amendment. But even if there were some issue of fact, if this court were to find one, at that point the second prong of qualified immunity, the Al-Kid Ashcroft decision from the Supreme Court in 2011, states that a right is only clearly established if the right was so clearly established that every reasonable officer would have understood that what they were doing violated the Constitution. And so if there are no standards about the parameters or guidelines or whatever for how many times a person can be tased in a certain period of time, how do you get to that, I guess, common body of knowledge so that officers know how to be guided? I see my time is up. May I finish answering Your Honor's question? That's the system, and I say it this way. It's a body of case law. We advise our clients to look at what the courts have decided. When the courts say on these facts the Fourth Amendment is violated, now the officers are on clear notice. And so it's the level of generality problem that the courts have struggled with for many, many years. But here I don't think there's a violation of the Fourth Amendment, and even if the court were to find that the facts construed most favorably for the appellant could create an issue of fact, then the court is obviously free to say that and make that ruling, and then under the established precedent the officers would be on notice that in a future case they might be subject to suit. If the court were to say that, just by way of example, there's some kind of police chief's report that says how often you can use tasers, and if a court were then to say, okay, we've decided that that's the constitutional standard, then that might make it clearly established. Correct, Your Honor. Anything else, judges?  All right, we have two minutes for rebuttal. Thank you, Your Honor. Just a couple points here. I acknowledge that there was some active resistance, but I think what the court needs to focus on is, like Judge White indicated, this is a neutralized, immobilized person, and there was an opportunity. There were six officers on scene here, and there was an opportunity while Mr. Jackson was immobilized to conduct any sort of frisking or identifying of a weapon, and there was an opportunity at that point to place handcuffs on him. When you say a neutralized, immobilized person, you're referring to the three minutes before we get into the next tussle. That's correct, Your Honor, and I think that's what I want the court to focus on as far as the objective unreasonableness of tasing somebody that number of times when, in fact, there's testimony that he was immobilized. Yes, he's an eight-time convicted felon, but that doesn't give anyone a right to tase someone that many times. If you have any questions, I'll take them at this time. Thank you, counsel. Thank you. The case will be submitted. The remaining cases will be submitted on briefs, and we will adjourn the court. This kind of report is not adjourned.